The opinion of the Court was delivered by
WITHERS, J.
Charles Eussell assigned property, real and personal, including choses in action, he and the assignee being domiciled in Florida, which was the situs of the bulk of the property; and among the choses in action which the terms of the deed will embrace, is a bill of exchange, drawn upon and accepted by the defendants, in favor of Eussell and held for him here. We shall assume, for the present, that the deed was duly executed in New Orleans, at the date it bears, which is February 8, 1854, or, at any rate, prior to the service of attachments by certain creditors here, on the 14th of March and the 24th of May, 1854. Upon this case a question is raised, whether the right of the assignee, though prior in date, according to the force and effect of the assignment, shall yield to the liens of the attaching creditors, though posterior in date. ■
It is to be premised that such an assignment as this would be perfectly consistent with our law, if executed here in due form; and we, of course, assume that it is agreeable to the law of Florida, until the contrary appears. It is also to be observed, that the distinction is clear and fundamental, upon the question now in view between a voluntary disposition of *312 personal effects executed in another jurisdiction, and including certain effects here, and a disposition of such property in invitum, by operation of law. In tbe latter case tbe operation of tbe foreign law would not.be recognized as regulating tbe disposition of an insolvent’s effects in South Carolina, upon tbe general principle that such law is necessarily intra territorial. Tbe position is illustrated by tbe case of Crowder, Clough & Co., ads. Robinson, 4 McC. 519. In tbe former case, however, the rule is widely different, where the act of tbe owner gives tbe law of disposition. It was stated in tbe case of Sill vs. Worswick, 1 H. Bl. 690, as follows: “It is a clear proposition not only of tbe law of England but of every country in tbe world where law has tbe semblance of science, that personal property has no locality. Tbe meaning of that is, not that personal property lias no visible locality, but that it is subject to that law which governs tbe person of tbe owner, both with respect to tbe disposition of it, and with respect to tbe transmission of it, either by succession or by the act of tbe party. It follows the law of tbe person. Tbe owner in any country, may dispose of bis personal property” — per Loughborough. In Doe d. Birtwhistle vs. Vardill, 5 Barn. & Cresw. 438-52, Chief Justice Abbott said, “personal property has no locality. And in respect to that it is not correct to say, that the law of England gives way to the law of tbe foreign country; but it is part of the law of England that personal property should be distributed according to tbe jus domiciliiP “Tbe same doctrine (says Judge Story) has been constantly maintained, both in England and America, with unbroken confidence and general unanimity.” Conflict of Laws, sec. 380.
It is upon such basis that our decisions have uniformly proceeded in recognizing a valid prior voluntary assignment of personal property, executed in another jurisdiction, as overriding a subsequent attachment on the same property here.
*313 It is argued, however, that voluntary conveyances of parties abroad are not to be beld valid in all cases, as where they are prejudicial to the rights and remedies of our own citizens; and it is suggested, that this consideration has been overlooked, becáuse not brought to the attention of the Court, when it has been decided that they should outrank the posterior liens under our law of foreign attachment. There are such exceptions, certainly, to the general rule of lex domicilii, (being part of the jus gentium,) which general rule is, that the law of the domicil should determine the validity of every transfer, alienation, or disposition, made by the owner of his goods and chattels and choses, whether it be inter vivos, or post-mortem. These exceptions are founded upon the nature of the particular property, the transfer of which is regulated by local laws. Among such exceptions have been mentioned contracts respecting public funds and stocks of incorporated companies. “But (says Mr. Story) contracts to transfer such property would be valid if made according to the lex domicilii of the owner, or the lex loci contractus, unless such contracts were prohibited by the lex rei sites." Conf. Laws, sec. 383. It is undeniable, as was said by O. J. Tilghman, in Moreton vs. Milne, 6 Binn. 361, that every country has the right of regulating the transfer of all personal property within its* territorial limits; but when no positive regulation exists, the owner transfers it at his pleasure.”
It is very questionable whether Courts, drawing authority only from the common law, are warranted in establishing any such “positive regulations;” thus qualifying the general and wholesome rule of comity which recognizes, upon the authority of the well-settled law of Nations, the lex domicilii, which itself is founded upon the nature of personal property, as interpreted by the common law of England, as well as the civil law. It becomes the more doubtful when we remember that this law of domicil, acting upon movables transitory in *314 tbeir nature, subserves tbe general convenience of nations, and equally affects tbe subjects and interests of all, and especially commercial sovereignties, wbicb is so well set forth by Judge Story, in bis 9th chap, of tbe Conflict of Laws. It is far safer to leave any contravening positive regulation to tbe wisdom and discretion of tbe law-making power, who alone should resolve bow far tbe just rights and interests of our citizens may claim interposition. We think, therefore, that tbe course of our decisions upon tbe contest between assignments abroad and our attachment law here, is by no means without solid foundation, if tbe rule adopted was properly open to debate. Nor are we disposed to yield to contrary views found in decisions in Louisiana, Massachusetts and Maine. Such views, if generally adopted, would lead to tbe sequestration, by each sovereignty, of tbe goods of a foreigner or of a citizen of another of these States, found within his territory; and it is so doubtful, to say the least, whether that consequence could be for the benefit of any people, that we should await the command of the supreme power before we would move in that direction. Besides, we observe, that in Louisiana the Court thought that it discovered a peculiar necessity for its position in the circumstances of the commerce of New Orleans, and, like the Court of Massachusetts, invoked the rule of law said to prevail in each, that actual delivery of personalty, not symbolical, was requisite to complete the transfer of title, even of a ship, as in the case in Louisiana. These decisions do not seem to have won the approbation of Judge Story, as we think may be discovered in the chapter above cited. And it may be added, that in some of them the case was supposed to be varied by the question, whether the attaching creditor had notice of the assignment before he laid his lien; and the like consideration has been suggested in this argument. We are not aware that this has any influence with us.
We are next presented with the position that the Act of *315 1828, 6 Stat. 365 “Regulating assignments of debtors,” is sucia a “positive regulation,” in tbe. sense of Chief Justice Tilghman as supersedes all assignments that cannot be conformed to the scheme of administration therein prescribed.
In speaking of the assignment involved in the case Crowder Clough & Co.ads. Robinson, it was said, “independently of the interest which creditors residing here may have in the property assigned, there is no question that as between the parties the assignment would be binding here as well as in England; and supposing it to have been voluntary and binding according to the laws of that country, and not inconsistent with our laws, the Courts, here, would, upon well settled principles of universal law, be bound to give it effect and operation.” It is quite true, therefore, that if the assignment now in question be inconsistent with the Act of 1828, it cannot operate here at all, as against a rival creditor, our own citizen.
The first clause of that Act shows that the provisions relate alone to an assignment by a debtor for the benefit of his creditors, and such is the assignment now before us. It makes it lawful for the creditors, when such an assignment is made, and they are authorized and empowered, to appoint an agent, one or more, to act jointly with the assignees, one or more; for which purpose the assignee is to call the creditors together within ten days from the execution of the assignment. The consequence for default in this respect is, that the creditors may meet together and appoint their agent who shall supersede the defaulting assignee. Any sales or transfers by the latter within the ten days specified, are declared void. Then a mode of deciding contested questions is prescribed; proceeds of the sales of the assigned property are to be deposited in bank in the joint names of the assignee and agent; they are to account before the creditors or their committee every three months; and the amount of commissions is prescribed. Such is the scheme of the Act of 1828, compressed into a *316 narrow abstract. It seems to us, manifestly to contemplate, not tbe validity of assignments, but the administration of them, a regulation in restraint of assignee as well as agent; and a priority of right among creditors prescribed in an assignment cannot depend upon legislation having such purview only. It nowhere discloses that a non compliance with any or all of its provisions shall render the assignment itself null and void, in whole or in part, whether such default proceed from agent, assignee, or creditors, some or all. It is necessarily territorial in its scope, as much so and for the same reasons as the bankrupt or other laws, of a foreign country beyond its limits. There is also reason to contend that the intent of the Act did not reach assignments made without our limits, because the creditors are to be called together within ten days from the execution of the deed, which could scarcely have been deemed practicable in the case of an assignment in foreign parts. A majority of the amount of debts represented by the creditors shall govern in the appointment of an agent. This scheme could scarcely look to an assignment executed in another state, or country; distant it might be; to be administered there; with the bulk of the property there; all the creditors there, perhaps, save one or two; and little property here, perhaps only a chose in action. Some at least of these circumstances attend the present case. These considerations do not favor the conception that the said Act, meant either to draw to itself the administration of an assignment executed elsewhere, or failing in that, to render it void. If it could be applied to this assignment, and ought to be and is not, still the rights of creditors could not be affected however the powers and conduct of the assignee might be, unless indeed sucb non conformity be adjudged to work the nullity of the instrument of assignment, which we ' have seen it would not do in the case of an assignment wholly domestic. Nor ought so grave a consequence to rest upon inference, strained inference, being at the same time so mucb *317 in disagreement with that doctrine of comity wbicb recognizes bere the disposition of personalty executed elsewhere and valid there; a doctrine itself founded upon a cardinal view of the nature of personalty, a comprehensive consideration of great and general interests, so frequently adopted in our own adjudications, as it has been in so many other enlightened sovereignties, and equally favored by the civil and common law, and, 'therefore,-finding its way into the jus gentium.
It is not easy to see why there should be in the Act of 1828, any greater efficacy to avail a creditor here than he could find in our attachment laws. These last have repeatedly been held to be unavailing against a prior assignment abroad, valid there, and not otherwise, on its face, here ; and such decisions have been made both before and since the Act of 1828. Examples are presented in West vs. Tupper & Kimball, 1 Bailey 193 ; Green vs. Moury, 2 Bailey, 163; Mitchell and others vs. Smith, 3 Strob. 240.
We do not touch the question whether an assignor abroad, who has given an " undue preference,” in the sense of our insolvent debtors’ law, might not be met with an obstacle, if arrested here, within the period prescribed, and asking for the benefit of that law, as against a local execution creditor.
As to the consideration, that the assignment in question confers upon the assignee an equitable rather than a legal title, it is enough to say, that in either case, the assignment being good, it confers the right to demand and receive payment of the debtor, though the lex fori touching the form of remedy may require the use of the assignor’s name. “ This (says Justice Story, sec. 398, Conf. Laws,) is in perfect coincidence with the law of England and America.
So much upon the ground and the argument founded on the Act of 1828. The attaching creditors are not entitled to maintain their position in respect to that Act.
*318 We come now to tbe question of tbe law of evidence— whether there was evidence of such character as warranted the Court in placing the assignment before the jury and them in finding it well executed, and taking rank as of its date ?
This question also is attended by contrariety of decision; for there is not uniformity of opinion in English or American cases, perhaps we may say not even among our own. We have, however, a rule prescribed in Plunkett vs. Bowman, 2 McO. 138, which we think it proper to follow so far forth as this — that where a subscribing witness to an instrument is dead, or beyond the jurisdiction, something more than merely the proof of his handwriting is required before the defendant shall be held connected with the paper as maker. That the assignment in this .case came in collaterally, that is, was not the cause of action, will not present occasion to vary the rule of evidence; for in either case the question is whether the paper propounded is sufficiently proved to go to the jury, and the decision of the Court is invoked. In Edgar, admr., vs. Brown, 4 McC. 91, it was adjudged, that proof of the signature of the obligor to a bond, executed in Delaware, though no proof as to the signature of the attesting witnesses, who were not within the jurisdiction, was given, was sufficient; and this by virtue of the Act of 1802, which dispensed with the attendance of witnesses to bonds or notes, unless the defendant should swear or affirm that the signature was not his, and providing “ that the signature to such bond or note may be proved by other testimony.” But the ruling in Edgar vs. Brown, was in conflict with Myers vs. Taylor, 1 Brev. 245, which held, that under the said Act the handwriting of the attesting witnesses should be proved as well as that of the obligor. To the same effect was the case of Paisley vs. Snipes, ■ 2 Brev. 200, where the handwriting of the attesting witness was proved, though not called under the Act of 1802, yet it was adjudged that the signature of the maker of the note, *319 though, by mark, must also be proved. These two last oases were in manuscript when the case of Edgar vs. Brown, was decided, and probably were unknown to the Court. In the latter case Judge Johnson did observe, “ I am strongly inclined to the conclusion, that the evidence was admissible on the principles of the common law” — he may be taken to have meant sufficient, that is, proof of the handwriting of the obligor merely. But he did not so rule, and placed the case upon the Act of 1802. Then we have the later case of Trammel vs. Boberts and others, 1 McM. 305, where we find this: “ At common law the subscribing witness must have testified in person, and in case he were beyond the reach of the Court, then other witnesses by proving his handwriting, and the signatures of the makers of the note, would furnish legal, though secondary, evidence of the same facts.”
What proof have we in the present case ? Of two witnesses, one is examined and asked whether he saw Charles Russell sign the deed, whether his name thereto affixed is in his own handwriting, and the seal affixed or acknowledged by him— whether he delivered the deed, and how. He answers, “I don’t remember anything about this transaction. I signed my name as a witness. It is in my handwriting, and I believe the signature of Monaghan (the other witness) to be genuine. I don’t know what was done with the deed. I don’t know the plaintiff. I don’t remember anything about this deed. I don’t know anything about Charles Russell.” Other witnesses verified the signature of Monaghan as attesting the deed, and also what purported to be his certificate, in capacity of commissioner under authority of Florida, and it appeared that he had departed from New Orleans, and was not otherwise accounted for.
Such was the whole proof of the execution of the assignment.
It is evident that the witness examined instead of supporting rather weakened the plaintiff. He knew nothing of the *320 identity of tbe obligor; nothing as to tbe delivery or disposition of tbe deed. He says nothing of tbe presence of the assignee. lie shook if he did not rebut such presumptions as might have arisen from proof of his handwriting merely, where that might have been accepted, and he did not even say he would not have signed the paper if he had not seen it duly executed. So that the execution of it rests solely on such inferential presumption as may arise out of the signature of Monaghan, affected more or less as different minds may view it by what the witness examined has said. In such circumstances we think our own cases teach, that the writing of Russell, the assignor, or something else should have been proved before he could be held-connected with the assignment, and the delivery (a very important point in this case) be presumed as of even date with the deed. It can be easily conceived (cases have been known indeed), that one may assume a name and palm himself off on witnesses fraudulently, while personating another and forging his name. • Loose and facile presumptions as to delivery and the time of it, may work much injustice, especially in such cases as this. We think Plunkett & Bowman, and Trammell & Roberts, well founded, (Simms & De Graffinreid, 4 McCord, 253, may perhaps have proceeded on the ground that the instrument there was a conveyance of realty, requiring two witnesses; but there also the handwriting of both witnesses and grantor was required to be proved). There is support for our cases and the opinion we now entertain in conformity to them.
One is Parkins vs. Hawhshaw, 2 Stark. N. P. 239, (3 Com. Law, 393). The witness saw a person introduced as Hawkshaw execute a bond, and he gave some description of his person but could not identify him as the defendant. Holroyd, J., nonsuited the plaintiff. In the case of Nelson vs. Whitlall, 1 Barn. & Ald. 19, Bailey, J., said, “It is laid down in Mr. Phillips’ treatise on Evidence, that proof of the handwriting of the attesting witness is in all cases sufficient. I always *321 felt the difficulty, that that fact alone does not connect the defendant with the note. If the attesting witness himself gave evidence he would prove not merely that the instrument itself was executed, but the identity of the person so executing it. But the proof of the handwriting of the attesting witness establishes 'merely that some person, assuming the name which the instrument purports to bear, executed it: and it does not go to establish the identity of that person, and in that respect the proof seems to me defective.” This reasoning was adopted and distinctly converted into a rule of law by the concurrence of Bailey and three other Barons of the Exchequer, in Whitlock vs. Musgrove, 1 Exch. 511. The action was on a promissory note executed by the maker using a mark. In addition to proof of the writing of the subscribing witness, some proof in addition of the identity of the party sued and the maker was held necessary. (In such a case, a mark being used, our decisions would appear to regard the proof offered to be sufficient, Bussey ads. Whitaker, 2 N. & McO., 374.) “ I quite agree (said Bailey) it is not necessary to prove the handwriting of the defendant; but if you do not prove that you must prove something else to connect the party sued with the instrument.” Examples were suggested, as that the instrument might designate the party by residence or otherwise, and the evidence might show the correspondence of the defendant, and there may be various other means of attaining the end, prima facie. It is seen from this case that the point was long questio vexata in England, and it was conceded that Lord Tenterden, followed by Best, held the contrary opinion. But it is presumed, that the case last cited, concurred in as it was, by Lord Lyndhurst, may be-regarded as strengthening our conclusion.
Some evidence was necessary in addition to what was adduced on the circuit, to show the due. execution of the assignment by Bussell, as proof of his handwriting or some *322 thing else to connect him with the instrument, before the paper could go to the jury.
And upon this ground a new trial is ordered.
Wardlaw and G-lover, JJ., concurred.
WhitNer and MuNRO, JJ., thought the proof in reference to the execution of the deed of assignment by Eussell, made & prima fade case properly submitted to the jury, and their verdict should not be set aside. Upon the other point made in the case they concurred with the majority.

New trial ordered,.